## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00122 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CAROL J. DELGADO and | ) | |
| BRENT D. HOUCK | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants Carol Delgado and Brent Houck are charged with five counts of bank fraud, in violation of 18 U.S.C. § 1344(1). Broadly speaking, Delgado and Houck are alleged to have used companies controlled by Delgado to obtain bank loans that they represented were for the companies' operations but then they actually used the money for their own personal benefit. Delgado has exercised her right to represent herself in this matter, whereas Houck is represented by counsel. Now before the Court are Delgado's motions to dismiss the Indictment (Dkt. No. 109) and to suppress evidence seized pursuant to search warrants (Dkt. No. 101). Houck joins both motions. (Dkt. Nos. 113, 114.) In addition, Houck has separately moved for a bill of particulars. (Dkt. No. 116.) For the reasons that follow, Delgado and Houck's motions are denied.

## BACKGROUND

On June 13, 2018, the grand jury returned an Indictment charging both Delgado and Houck with five counts of bank fraud. The Indictment alleges as follows.[1]

Delgado served as the president and chief executive officer ("CEO") of Financial Management Services, Inc. ("FMSI"), a company that, along with its associated entities, made loans primarily to contractors in the construction industry. (Indictment ¶¶ 1(a), (c), Dkt. No. 16.)

---

[1] The Court summaries the allegations of the Indictment for purposes of evaluating the present motions while of course recognizing that Delgaldo and Houck are presumed innocent of the charges against them until proven guilty.

In addition, Delgado owned 50% of FMSI's holding company, FMSI of Delaware, Inc. ("FMSI of Delaware"). (*Id.* ¶ 1(c).) Delgado was also the owner, sole member, and manager of Renewable Assets Management Company, LLC ("RAMCO"), a company that provided residential solar financing through a network of solar power system installation companies, and the CEO, manager, and sole owner of RAMCO's holding company, RAMCO Holdings, LLC. (*Id.* ¶¶ 1(b), (c).) Houck worked for Delgado as an employee of both FMSI and RAMCO. (*Id.* ¶ 1(d).)

On October 29, 2013, FMSI entered into a business loan and security agreement with the PrivateBank and Trust Company ("PrivateBank"),[2] which Delgado executed on behalf of FMSI. (*Id.* ¶ 1(e), (f).) Under the loan agreement, PrivateBank agreed to lend FMSI up to $10 million on a revolving-note basis. (*Id.* ¶ 1(f).) In turn, FMSI would use the line of credit to make its own loans to its construction-contractor customers. (*Id.*) On December 19, 2014, PrivateBank entered into a similar business loan and security agreement with RAMCO, the purpose of which was to fund loans that RAMCO represented it would extend directly to homeowners installing solar energy products. (*Id.* ¶¶ 1(g), (h).) Delgado executed the loan agreement on behalf of RAMCO. (*Id.* ¶¶ (f), (g).) As collateral for the loan agreements, PrivateBank received security interests in, and liens against, the loans that FMSI and RAMCO made to their customers. (*Id.* ¶ 1(h).)

The loan agreements required FMSI and RAMCO to submit to PrivateBank each month borrowing base certificates providing information about the loans that each company extended to its customers. (*Id.* ¶ 1(h).) In addition, FMSI and RAMCO were required to submit monthly compliance certificates affirming that each company was in compliance with the terms and conditions of its agreement with PrivateBank. (*Id.* ¶ 1(i).) The loan agreements also generally

---

[2] In June 2017, PrivateBank and its parent company were both acquired by another bank and PrivateBank was renamed. (Indictment ¶ 1(e).) For present purposes, the Court refers to the entity solely by its pre-acquisition name, PrivateBank.

forbade FMSI and RAMCO from entering into any transaction with any of their affiliates or any of their directors, officers, or employees. (*Id.* ¶ 1(j).)

According to the Indictment, Delgado and Houck initiated a scheme to defraud PrivateBank shortly after the October 2013 execution of the FMSI loan agreement. (*Id.* ¶ 2.) Their alleged scheme involved using FMSI and RAMCO to obtain millions of dollars from PrivateBank by falsely representing that the funds would be used for the companies' lending activities when, in fact, Delgado and Houck used a substantial portion of PrivateBank's funds for their own personal expenses. (*Id.* ¶¶ 2–3.) In furtherance of the alleged fraud, Delgado and Houck created false documentation for fake construction companies and then represented to PrivateBank that those fictitious companies were seeking loans from FMSI or RAMCO. (*Id.* ¶¶ 4–6.) Further, Delgado submitted borrowing base certificates and compliance certificates to PrivateBank that contained false information about FMSI and RAMCO's lending activities and the companies' compliance with the terms and conditions of their loan agreements with PrivateBank. (*Id.* ¶ 7.)

Between January 2014 and August 2016, Delgado and Houck submitted to PrivateBank approximately $4 million in false and fraudulent loan requests that were used not to finance FMSI and RAMCO's lending activities but instead largely for Delgado and Houck's personal benefit. (*Id.* ¶ 8.) Delgado and Houck used the remaining portion of PrivateBank's funds to repay older loans that were supposedly issued to the fictious companies to create the appearance that those fake companies were real and viable entities. (*Id.*) Each of the Indictment's five counts is predicated on a transfer made by PrivateBank to an account associated with Delgado and Houck.

## DISCUSSION

Delgado has moved to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). In addition, Delgado has filed a motion to suppress evidence seized by the

Government in connection with its execution of search warrants authorized by a Magistrate Judge. Houck has joined both of Delgado's motions and also seeks a bill of particulars under Federal Rule of Criminal Procedure 7(f). The Court begins with the challenges to the sufficiency of the Indictment before turning to the motion to suppress.

## I.     Motion to Dismiss Indictment

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a criminal defendant may, prior to trial, move to dismiss an indictment as defective. Federal Rule of Criminal Procedure 7(c)(1) requires an indictment or information to provide a "plain, concise, and definite written statement of the essential facts constituting the offense charged." In considering a motion to dismiss an indictment, the Court "must view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). In the Seventh Circuit, an indictment is considered "sufficient if it first, contains the elements of the charged offense and fairly informs a defendant of the charge against him which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution." *United States v. Locklear*, 97 F.3d 196, 199 (7th Cir. 1996) (internal quotation marks omitted). "The question before a court on a motion to dismiss is not whether the indictment alleges facts from which a jury could find that a defendant violated a given statute, but whether the Government conceivably could produce such evidence at trial." *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004).

As an initial matter, Delgado asks the Court to take judicial notice of certain facts from outside the Indictment in evaluating its sufficiency. Among other things, Delgado wants the Court to consider the contents of PrivateBank's loan agreement with FMSI and court records from a separate civil proceeding. However, the Court declines Delgado's request to consider such outside information. A motion to dismiss an indictment "tests only whether an offense has been

4

sufficiently charged" and is "not intended to be a summary trial of the evidence." *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) (internal quotation marks omitted). Accordingly, a "defendant is not permitted to transcend the four-corners of the indictment in order to demonstrate its insufficiency." *United States v. DiFonzo*, 603 F.2d 1260, 1263 (7th Cir. 1979). Rather, "[a]n indictment is reviewed on its face, regardless of the strength or weakness of the government's case." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). Here, Delgado's request for judicial notice essentially asks the Court to consider evidence that she believes undermines the Government's case. But a motion to dismiss is not a vehicle for "challeng[ing] the strength of the government's case or the sufficiency of the evidence." *United States v. Smith*, 555 F. Supp. 3d 563, 573 (N.D. Ill. 2021); *see also United States v. Galicia*, No. 15 CR 308, 2019 WL 1254930, at *3 (N.D. Ill. Mar. 19, 2019) ("[I]f a Rule 12(b)(3)(B)(v) motion is 'substantially intertwined with the evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact' and must be denied." (quoting *Yasak*, 884 F.2d at 1001 & n.3)). Therefore, Delgado's arguments for dismissal that rely on facts outside the Indictment fail.

Turning to Delgado's remaining arguments for dismissal, the Indictment charges both Delgado and Houck with five counts of bank fraud, in violation of 18 U.S.C. § 1344(1). To obtain a conviction under § 1344(1), the Government must prove beyond a reasonable doubt: "(1) there was a scheme to defraud a financial institution; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; and (4) the deposits of the financial institution were insured by the [Federal Deposit Insurance Corporation ("FDIC")] at the time of the charged offense." *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2013) (internal quotation marks omitted). Further, the scheme must "involve[] a materially

false or fraudulent pretense, representation, or promise." *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020).

The first element of a § 1344(1) offense is the existence of a scheme to defraud. A "scheme to defraud" requires the Government to show that the defendant "engage[d] in a pattern or course of conduct designed to deceive a financial institution with intent to cause actual or potential loss." *United States v. LeDonne*, 21 F.3d 1418, 1427–28 (7th Cir. 1994). Delgado contends that the Indictment fails to charge a scheme to defraud adequately because it contains no allegation of any specific and material misrepresentation made by either her or Houck. However, the "term ***scheme to defraud*** . . . was broadly conceived to include conduct designed to deceive in order to obtain something of value, which contrary to [Delgado's] position, may or may not include conduct involving false statements or misrepresentations of fact." *Id.* at 1426. Indeed, to convict, "[i]t is not necessary for [the Government] to prove that the defendant made any specific misrepresentations or false statements." *United States v. Higgins*, 270 F.3d 1070, 1074 (7th Cir. 2001). Consequently, the lack of a specific falsehood or misrepresentation in the Indictment does not mean that it must be dismissed. In any case, the Indictment contains enough specifics to inform Delgado and Houck of the charged scheme to defraud, as it lists ten fictitious companies that Delgado and Houck represented to PrivateBank were receiving loans from FMSI and RAMCO and describes the false documents that they submitted to PrivateBank in furtherance of their scheme.

Relatedly, Delgado claims that the Indictment fails to allege the materiality of the scheme to defraud. She emphasizes that the Indictment is completely silent as to materiality. But the lack of an express allegation of materiality is not fatal, as "the term 'scheme to defraud' itself incorporates the well-settled understanding that falsehoods must be material." *Smith*, 555 F. Supp.

3d at 576 (citing *Neder v. United States*, 527 U.S. 1, 22–25 (1999)); *cf. United States v. LeBeau*, 949 F.3d 334, 342–43 (7th Cir. 2020) ("The district court could reasonably have determined that the term 'fraud' embodies the concept of materiality . . . ." (internal quotation marks omitted)).

Here, the Court finds that the Indictment's allegations amply set forth a material scheme to defraud. That the scheme involved a materially false pretense is shown by the various actions Delgado and Houck allegedly took to convince PrivateBank that its funds were being used for FMSI and RAMCO's legitimate business activities even though the two were actually using the funds to enrich themselves. Undoubtedly, PrivateBank may have decided against extending $4 million in loans to FMSI and RAMCO had it known that the construction and solar energy businesses supposedly being funded by FMSI and RAMCO were fake. *See Ginsberg*, 971 F.3d at 698 ("Materiality requires only the tendency or capability of influencing the victim; there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations." (internal quotation marks omitted)).

Delgado also argues that the Indictment fails to allege that she had the intent to defraud a financial institution. The gist of her argument seems to be less about intent and more directed toward whether the Indictment alleges that PrivateBank is an FDIC-insured financial institution. But the Indictment expressly alleges that PrivateBank's deposits were FDIC insured (Indictment ¶ 1(e)), and therefore the Court can quickly dispose of Delgado's contention otherwise. Moreover, the Indictment's allegations assert that each of Delgado and Houck acted with an intent to defraud PrivateBank. As alleged, Delgado and Houck knowingly submitted paperwork designed to make fake companies appear real for the purposes of obtaining loans for those fake companies but in fact used the funds for their own personal benefit. *See United States v. Jackson*, 540 F.3d 578, 594 (7th Cir. 2008) ("Falsifying information on loan documents is circumstantial evidence of intent to

defraud."). Such conduct "demonstrate[s] that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *LeDonne*, 21 F.3d at 1426; *see also United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995) ("We have defined intent to defraud as acting willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.").

Separately, Houck claims that the Indictment fails to demonstrate his intent to defraud because the Indictment claims only that Delgado was involved with the execution of the FMSI and RAMCO loan agreements. According to Houck, because knowledge of what was in the loan agreements was necessary for him to have an intent to defraud PrivateBank, the Indictment does not satisfy that element as to him. Yet Houck could have had knowledge of the loan agreements' contents even if he was not involved in executing them. The existence or non-existence of his knowledge is an evidentiary matter for trial, not a basis for dismissing the Indictment as to him. Moreover, the Government is not required to prove that Houck "personally and directly executed every part of the scheme and prepared every document involved." *Ginsberg*, 971 F.3d at 696. Rather, it need only prove that "he knowingly, with an intent to defraud, ***participated*** in a scheme involving materially false representations." *Id.* at 697. And the Indictment adequately details Houck's knowing participation in the scheme; for example, it describes his involvement in the creation of the fictitious companies and the drafting of documentation meant to make those companies look real. (Indictment ¶¶ 5–6.)

Finally, Delgado contends that the transfers underlying each of the five counts of the Indictment do not properly charge executions of a scheme to defraud because a simple transfer involves no false pretense or representation. But the execution of a scheme to defraud cannot necessarily be conflated with the scheme to defraud itself. *See United States v. Longfellow*, 43

F.3d 318, 323 (7th Cir. 1994) ("[T]he bank fraud statute punishes each execution of a fraudulent scheme rather than each act in furtherance of such a scheme. However, a single scheme can be executed a number of times." (internal quotation marks and citations omitted)). And here, the charged transfers were executions of the scheme because each transfer put PrivateBank at an additional risk of financial loss. *See United States v. Anderson*, 188 F.3d 886, 888 (7th Cir. 1999) ("[T]he crime of bank fraud is complete when the defendant places the bank at a risk of financial loss . . . ."); *United States v. Ford*, No. 12 CR 927, 2013 WL 5878261, at *2 (N.D. Ill. Oct. 31, 2013) (explaining that "each draw against the line of credit imposed independent risk on the bank" and therefore constituted separate executions of the scheme to defraud).

In sum, the Court finds that the Indictment sufficiently charges Delgado and Houck as to each element of the crime of bank fraud. For that reason, Delgado's motion to dismiss the Indictment, joined by Houck, is denied.

## II.    Motion for a Bill of Particulars

Having concluded that the Indictment survives dismissal, the Court now considers Houck's request that the Government be ordered to provide him with a bill of particulars. Federal Rule of Criminal Procedure 7(f) allows a district court to direct the Government to file a bill of particulars. A bill of particulars is "a more specific expression of the activities defendant is accused of having engaged in which are illegal." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991). In deciding a motion for a bill of particulars, "the key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation." *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008). However, a "defendant is only entitled to be informed of the charges against him; he is not entitled to know the details of how the government will go about proving its case." *United States v. Vasquez-Ruiz*,

136 F. Supp. 2d 941, 942 (N.D. Ill. 2001). "In considering whether to require a bill of particulars, the court may consider the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill of particulars." *Id.* at 942–43.

Houck claims that a bill of particulars is necessary because the Indictment alleges his involvement in Delgado's scheme even though Houck had no relationship with PrivateBank. In particular, Houck asserts that nowhere in the Government's discovery is there any evidence that he had any interactions with PrivateBank regarding the loan agreements or submitted any borrowing base certificates or compliance certificates. Consequently, Houck claims that he needs more information regarding what he supposedly did to commit bank fraud and requests that the Government identify and describe the following: any and all representations Houck personally made to PrivateBank; any and all funding requests that Houck personally made to PrivateBank; any and all records, documents, and materials indicating that Houck reviewed the FMSI and RAMCO loan agreements; all borrowing base certificates signed, reviewed, or approved by Houck; and all compliance certificates signed, reviewed, or approved by Houck.

As discussed above, the Indictment need only allege that Houck knowingly participated in a scheme to defraud, not that he personally directed every aspect of the scheme. Indeed, "co-schemers are jointly responsible for one another's acts in furtherance of the scheme." *United States v. Jackson*, 546 F.3d 801, 815 (7th Cir. 2008). While Delgado may have been the person primarily, or even exclusively, responsible for managing FMSI's and RAMCO's relationships with PrivateBank, Houck can still be held criminally responsible as a knowing participant in the scheme. *Id.* And the Indictment provides sufficient details as to how Houck knowingly participated in the scheme. For example, Houck is alleged to have worked for Delgado and been involved in creating the fake companies, and the Indictment identifies ten of the fake companies

by name. (Indictment ¶¶ 1(d), 5.) Moreover, the Indictment alleges that between January 2014 and August 2016, Houck (along with Delgado) knowingly submitted over $4 million in fraudulent loan requests to PrivateBank pursuant to the FMSI loan agreement and then pocketed most of those funds for his or Delgado's personal benefit. (Indictment ¶ 8.) The Indictment also lists transfers made in execution of the scheme to accounts associated with Houck. Again, because Houck, as a co-schemer, can be held responsible for actions taken by Delgado alone, his requests for information regarding his own direct interactions with PrivateBank are unnecessary. Accordingly, the Court denies Houck's motion for a bill of particulars.

### III.    Motion to Suppress

In August 2017, the Government applied for a warrant to search: (1) an office space used by FMSI; (2) a residence used by Delgado, Houck, and another RAMCO officer as office space; (3) five server backup tapes in the possession of a former FMSI employee; and (4) certain domains and email accounts hosted by Yahoo and Google associated with FMSI and RAMCO. In support of its application, the Government included an extensive affidavit from a Federal Bureau of Investigation ("FBI") special agent describing the Government's investigation of Delgado and Houck and setting forth the evidence providing probable cause to believe that a search of the listed locations, domains, and servers would uncover evidence of violations of 18 U.S.C. §§ 1343[3] and 1344. A Magistrate Judge signed the search warrants on August 18, 2017, authorizing each of the Government's requested searches.

Delgado moves to suppress the evidence seized by the Government pursuant to the search warrants. Her briefs in support of suppression total more than 200 pages and purport to raise numerous deficiencies in the search warrants. A large portion of Delgado's voluminous briefing is

---

[3] Title 18 U.S.C. § 1343 is the wire fraud statute. Ultimately, the Indictment did not include any wire fraud charges.

devoted to identifying various weaknesses in the Government's case even though such factual issues are matters for trial rather than a motion to suppress. When those factual attacks are pared from the motion to suppress, the Court is left with five cognizable challenges to the searches, and it will discuss each in turn.

### A.    Involvement of FBI Contractor in Search

During the searches of the FMSI office and the residence used as office space, an FBI contractor forfeiture investigator ("CFI"), Patrick Murphy, was present to assist the FBI with the asset forfeiture component of the investigation. Delgado asserts that the search warrants did not authorize the involvement of a private individual at those searches. For that reason, Delgado claims Murphy's presence violated her Fourth Amendment rights and that the evidence seized at the office and residence must be suppressed.

Under 18 U.S.C. § 3105, "[a] search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution." Thus, § 3105 authorizes a private individual to be present at a search so long as the individual is "assisting or acting 'in aid of' an officer conducting a search authorized by warrant." *Buonocore v. Harris*, 65 F.3d 347, 358 (4th Cir. 1995); *see also Bellville v. Town of Northboro*, 375 F.3d 25, 32 (1st Cir. 2004) ("Federal constitutional law does not proscribe the use of civilians in searches. In fact, Congress has explicitly authorized the practice . . . ." (citing 18 U.S.C. § 3105)).

Here, it is far from certain that Murphy can be regarded as a private individual, since he was present at the searches in his capacity as an FBI contractor. (Gov.'s Resp. to Delgado's Mot. to Suppress, Ex. B, Murphy Decl. ¶¶ 3, 5–6, Dkt. No. 119-2.) But even if Murphy is treated as a

private individual, the Government has demonstrated that Murphy was aiding the FBI during its searches. In a declaration submitted to this Court, Murphy explains that, as CFI, he assisted the FBI in executing six search warrants; his role during searches was to direct the FBI agents on site to materials that could potentially be useful in an asset forfeiture investigation, such as financial documents. (*Id.* ¶ 5.) Consistent with that role, Murphy states that he assisted the FBI with the asset forfeiture component of its investigation of Delgado. (*Id.* ¶ 6.) While on the scene of the searches, Murphy reviewed documents to help flag financial records for the FBI agents supervising the execution of the search warrants. (*Id.*) Murphy further explains that he was present at the two search sites solely to assist the FBI and notes that he was prohibited from disclosing any information he learned in the course of the Delgado investigation to anybody outside of the FBI. (*Id.* ¶¶ 6–8.) The Court concludes from this testimony and the circumstances of the searches that, because Murphy was assisting the FBI in conducting searches authorized by warrants, his presence at the site of the searches did not violate Delgado's Fourth Amendment rights.

### B. Inaccuracies in Affidavit Supporting the Search Warrants

Delgado next claims that all evidence seized pursuant to the search warrants must be suppressed because the supporting affidavit submitted to the Magistrate Judge contained false and misleading statements. At minimum, Delgado requests that the Court hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether probable cause would have existed absent the purportedly false statements.

The Fourth Amendment provides that "'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,' typically provided by an officer's warrant affidavit to justify the search." *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013) (quoting U.S Const.

amend. IV). "An affidavit submitted in support of a search-warrant application will be sufficient to support a probable-cause finding if, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Junkert v. Massey*, 610 F.3d 364, 367–68 (7th Cir. 2010) (internal quotation marks omitted). And, in *Franks v. Delaware*, the Supreme Court made clear that warrant affidavits are presumed to be valid. *Franks*, 438 U.S. at 171.

To overcome the presumption of validity accorded to warrant affidavits, a defendant "must make a substantial preliminary showing that the officer who swore out the warrant affidavit made a false statement knowingly and intentionally, or with reckless disregard for the truth." *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (internal quotation marks omitted). If a defendant makes such a showing, a district court must then hold a *Franks* hearing, which is "an evidentiary hearing regarding the veracity of information included in a search warrant application." *United States v. Sanford*, 35 F.4th 595, 597 (7th Cir. 2022) (internal quotation marks omitted). The requisite preliminary showing requires the defendant to offer evidence demonstrating "that the warrant affiant lied or that the warrant affiant recklessly disregarded the truth because he in fact entertained serious doubts as to the truth of his allegations or had obvious reasons to doubt the veracity of the allegations." *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000). "This burden is substantial, and *Franks* hearings are rarely required." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009).

"An essential element of a preliminary *Franks* showing is a ***false statement***." *Dessart*, 823 F.3d at 402. Here, Delgado's primary contention is that the affidavit falsely states that FMSI (*i.e.*, Financial Management Services, Inc.) was a party to the FMSI loan agreement with PrivateBank when, in fact, it was FMSI of Delaware (and three other associated entities) that were parties to

14

the agreement with PrivateBank. (*Compare* Gov.'s Resp. to Delgado's Mot. to Suppress, Ex. A,

Warrant Aff. ¶¶ 2, 12–14, 19, Dkt. No. 119-1, *with* FMSI Loan Agreement, Dkt. No. 83-4.[4])

Delgado is correct that the FMSI loan agreement states up front that FMSI of Delaware was a

party to the agreement and that FMSI is not one of the listed co-borrowers. (FMSI Loan

Agreement at para. 1.) Moreover, the loan agreement also affirms that "[t]he exact legal name of

each of the Co-Borrowers is as set forth in the first paragraph of this Agreement, and each Co-

Borrower currently does not conduct, nor has it during the last five (5) years conducted, business

under any other name or trade name." (*Id.* § 7.1.)

Yet it is not apparent that the affidavit contains any falsehood with respect to FMSI's

status as a party to the FMSI loan agreement. As even Delgado acknowledges, it seems that the

affiant simply failed adequately to distinguish between FMSI and its holding company, FMSI of

Delaware. Early in the affidavit, it defines the acronym FMSI to refer to Financial Management

Services, Inc. Later on, the affidavit elaborates on the relationship between FMSI and FMSI of

Delaware:

> According to Ohio Secretary of State records, FMSI is an Ohio corporation,
> registered in or around 1973. According to FMSI's Consolidated Financial Report
> dated December 31, 2013, in or around December 2004, all of the shares of FMSI
> were acquired by [FMSI of Delaware]. [FMSI of Delaware] is a Delaware
> corporation that was registered in or around December 2004. [FMSI of Delaware]
> is owned 50% by Delgado. At the time that FMSI was acquired by [FMSI of
> Delaware], Delgado was the president and [CEO] of FMSI. [FMSI of Delaware],
> operates as a holding company for FMSI. Illinois Secretary of State records show
> that FMSI operates under the assumed name of "FMSI, Inc."

---

[4] Delgado originally filed her motion to suppress with the assistance of counsel. That motion attached as an
exhibit FMSI's loan agreement with PrivateBank. Subsequently, Delgado elected to represent herself and
her counsel withdrew from the case. Therefore, the original motion to suppress was terminated after
Delgado filed a new motion to suppress *pro se*. Delgado's brief in support of her *pro se* motion extensively
quotes from the FMSI loan agreement but does not attach a copy of the agreement as an exhibit. Since the
Government never disputed the authenticity of the FMSI loan agreement that was attached as an exhibit to
Delgado's previous motion to suppress, the Court considers that exhibit as evidence of the FMSI loan
agreement's substance.

(Warrant Aff. ¶ 13.) Then, in discussing FMSI's loan agreement with PrivateBank, the affidavit states:

> On or about October 29, 2013, [PrivateBank] entered into a business loan and security agreement (the "FMSI Loan Agreement") with FMSI and its associated entities, including FMSI Consumer Credit Corporation, Three Marketiers, and FMSI—Financial Resources. . . . The FMSI Loan Agreement was executed by Delgado, *who at the time signed the agreements as president and chief executive officer of FMSI of Delaware*, FMSI Consumer Credit Corporation, Three Marketiers, and FMSI—Financial Resources.

(*Id.* ¶ 19(a) (emphasis added).) Elsewhere in the affidavit, FMSI of Delaware is expressly acknowledged as the entity listed in the FMSI loan agreement. (*Id.* ¶ 86.)

To the extent that the affidavit states that FMSI and its holding company, FMSI of Delaware, are interchangeable, that statement may be technically false. *See, e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 380 (7th Cir. 2008) ("[T]he separate corporate entities of two corporations may not be disregarded merely because one owns the stock of another." (internal quotation marks omitted)). But there is no clear statement to that effect, and it is far from clear that the affidavit even implies that to be the case. Rather, the affidavit explains that FMSI was acquired by FMSI of Delaware and that FMSI of Delaware operates as FMSI's holding company. And while the affidavit uses the "FMSI" acronym to identify the party to the FMSI loan agreement, it also discloses that the loan agreement was executed by Delgado in her capacity as the president and CEO of FMSI of Delaware. Thus, it would appear that the flaw in the affidavit's treatment of FMSI and its holding company, FMSI of Delaware, is more an issue of imprecision rather than an outright falsehood.

Even accepting at face value that the affidavit falsely represented that FMSI was a party to the FMSI loan agreement and that falsehood was material, to succeed in her argument, Delgado must also prove that the affiant made the false statements intentionally or recklessly. To do so, she

must "put forth 'an offer of proof' that is 'more than conclusory' and gestures toward more than negligent mistakes." *United States v. Daniels*, 906 F.3d 673, 677 (7th Cir. 2018) (quoting *Franks*, 438 U.S. at 171). But Delgado offers nothing more than speculation. And considering that the affidavit disclosed FMSI and FMSI of Delaware's relationship and that the FMSI loan agreement was signed by Delgado acting for FMSI of Delaware, the Court cannot conclude that the affiant's conflation of FMSI and FMSI of Delaware was anything other than an innocent mistake. *See McMurtrey*, 704 F.3d at 509 ("Allegations of negligent or innocent mistakes do not entitle a defendant to a [*Franks*] hearing . . . ."). Nor did the affiant have any incentive to lie about which entity was party to the agreement with PrivateBank, since Delgado controlled both and both entities shared the same office space. (Warrant Aff. ¶¶ 2(a), 19(a), 97, 99); *see United States v. Lowe*, 516 F.3d 580, 585 (7th Cir. 2008) ("[W]e are unable to see what the government had to gain by creating these inaccuracies, since a correctly drafted affidavit . . . would have been perfectly acceptable—perhaps even more so than the affidavit at issue here."). Certainly, the Magistrate Judge's probable cause determination would not have been affected had she known that it was not FMSI but FMSI's holding company that was the vehicle Delgado used to commit the alleged bank fraud. *See United States v. Vines*, 9 F.4th 500, 510 (7th Cir. 2021) ("If probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." (internal quotation marks omitted)).

The other purported inaccuracies in the affidavit that Delgado identifies as necessitating suppression or a *Franks* hearing amount to little more than her commentary on the affidavit's evidence. Critically, Delgado comes forward with no proof either substantiating her claims that the relevant statements were false or that the affiant acted intentionally or recklessly with respect to those purported falsehoods. Thus, the Court finds that Delgado falls far short of undermining

17

the presumed validity of the affidavit supporting the search warrants here, as she has not even

show that the affidavit contained a material falsehood, let alone one that the affiant made

intentionally and that would have impacted the Magistrate Judge's probable cause determination.

### C.    Insufficient Particularity

According to Delgado, the warrants here gave overbroad descriptions of the items to be

seized, in violation of the Fourth Amendment's requirement that a search warrant "particularly

describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend.

IV. The particularity requirement "ensures that the search will be carefully tailored to its

justifications and will not take on the character of the wide-ranging exploratory searches the

Framers intended to prohibit." *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015)

(quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). A warrant that fails to satisfy the Fourth

Amendment's particularity requirement is "facially deficient" and may not be relied upon by the

executing officers. *Archer v. Chisholm*, 870 F.3d 603, 616 (7th Cir. 2017).

"[A]lthough warrants must describe the objects of the search with reasonable specificity,

the Constitution does not insist that they be elaborately detailed." *Id.* (internal quotation marks

omitted). A warrant describes the items be seized at a sufficient level of specificity where "the

officers executing the warrant are able to identify the things to be seized with reasonable

certainty." *United States v. Jones*, 54 F.3d 1285, 1290 (7th Cir. 1995) (internal quotation marks

omitted). Moreover, "a warrant must explicate the items to be seized only as precisely as the

circumstances and the nature of the alleged crime permit." *United States v. Vitek Supply Corp.*,

144 F.3d 476, 481 (7th Cir. 1998).

In this case, included with each of the warrants was an attachment listing the items to be

seized. (Warrant Aff. At 82–85; Gov.'s Resp. to Delgado's Mot. to Suppress, Ex. D, Dkt. No.

119-4; Delgado's Suppl. Mem. in Supp. Of Mot. to Suppress, Ex. 2, Dkt. No. 156.) Before listing the items to be seized, the attachments limit the categories of items to be seized to those that were evidence and instrumentalities concerning violations of 18 U.S.C. §§ 1343 and 1344. Then, the attachments list eighteen specific categories of information subject to seizure. The Court finds that the various categories were defined with sufficient particularity, as most categories properly confined the officers' search to items concerning FMSI's and RAMCO's relationships with PrivateBank and the fictitious companies (which are identified by name in the attachments) to which FMSI and RAMCO made "loans." Those descriptions hardly authorized the executing officers to rummage indiscriminately through the areas to be searched. *See Jones*, 54 F.3d at 1289–90 ("Th[e] particularity requirement protects persons against the government's indiscriminate rummaging through their property.").

Even the more general categories seeking items related to FMSI's and RAMCO's solicitation and use of funds from investors were appropriate based on what the investigators knew at the time. *See Archer*, 870 F.3d at 616 ("When granular detail is impossible, generic descriptions of the items to be seized are sufficient so long as they particularize the types of items to be seized."). Specifically, investigators had evidence suggesting that FMSI had attempted to defraud other investors and potential investors. (Warrant Aff. ¶¶ 90–96.) Put differently, there was evidence that FMSI's and RAMCO's fraud was not limited just to PrivateBank but may have affected a larger universe of investors and potential investors. Thus, a generic description related to FMSI's and RAMCO's solicitation of investors or use of investors' funds was appropriate in such circumstances. *See United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir. 1987) ("[I]f the fraud infects only one part of the business, the warrant must be so limited—but within that portion of the business 'all records' may be the most accurate and detailed description possible."). And,

again, the attachment expressly limited those more general descriptions by requiring that any seized items constitute evidence and instrumentalities of wire fraud and bank fraud. *See United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018) ("It is enough . . . if the warrant cabins the things being looked for by stating what crime is under investigation."); *see also United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Cir. 1984) ("[T]he warrant authorized only the seizure of writings related to the conspiracy to import heroin; it did not authorize a general, exploratory rummaging through [the defendant's] belongings to find any evidence of any crime."); *United States v. Cunningham*, No. 15-CR-83, 2016 WL 11445687, at *6 (E.D. Wis. Apr. 29, 2016) (finding a warrant sufficiently particularized where it contained a limitation allowing only the seizure of evidence related to violations of the food stamp and wire fraud statutes).

Contrary to Delgado's contention, the search warrants did not allow the Government to seize every single document found in the locations and devices to be searched. Rather, the Government was largely limited to seizing documents related to FMSI's and RAMCO's dealings with PrivateBank, the fictitious companies receiving loans from FMSI and RAMCO, or the solicitation or use of investor funds. Many of Delgado's arguments concerning particularity essentially amount to claims that the warrants were overbroad because they authorized the seizure of a large quantity of materials. Yet a "warrant authorizing the seizure of truckloads of documents, all on probable cause," does not, by itself, offend the Fourth Amendment. *Bentley*, 825 F.2d at 1110. "A criminal venture does not get extra protection by being large, generating extra paper." *Id.* Relatedly, Delgado argues that the Court should be particularly wary of the searches of her computers and electronic storage devices because the Government was essentially permitted to look through every file on those devices. But the Seventh Circuit has recognized that broad searches of electronic devices are permissible, so long as they are properly cabined by the

descriptions of the items subject to seizure, because "the incriminating evidence may be in any file or folder." *Bishop*, 910 F.3d at 337.

Nonetheless, two particularity issues identified by Delgado require closer examination. First, Delgado faults the warrants for failing to include a time limitation with respect to the items subject to seizure. Some courts outside the Seventh Circuit have found warrants invalid where they "imposed too wide a time frame or failed to include one altogether." *United States v. Cohan*, 628 F. Supp. 2d 355, 365–66 (E.D.N.Y. 2009) (collecting cases). On the other hand, it appears that most courts have regarded the lack of a time frame as relevant to the particularity analysis but not dispositive. *Id.* at 366; *see also United States v. Hernandez*, No. 09 CR 625(HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010) ("A temporal limitation in a warrant is not an absolute necessity, but is only one indicium of particularity." (internal quotation marks omitted)). That is the position taken by at least one court in this District. *United States v. Hollnagel*, No. 10 CR 195, 2011 WL 4375891, at *9 (N.D. Ill. Sept. 20, 2011). In *Hollnagel*, the district court observed that including a time frame would have been "preferable" but found that the "ten year breath [sic] of the alleged scheme" meant that "the government's failure to do so [was] not fatal." *Id.* Here, the alleged scheme to defraud PrivateBank covered at least a four-year time period. Moreover, Delgado does not suggest that she had a significant relationship with PrivateBank before the relevant loan agreements. That the warrants provided specific details limiting many categories of items to documents involving PrivateBank or the fictious companies would tend to sufficiently cabin the officers' search even absent a time limitation.

As discussed above, however, other categories listed in the warrant are more open-ended, particularly those regarding items relating to the solicitation or use of investor funds. Still, the Seventh Circuit has recognized there are instances where "a more particular description could

preclude effective investigation of the crimes at issue." *United States v. Shoffner*, 826 F.2d 619, 631 (7th Cir. 1987). The affidavit alleged an extensive scheme involving PrivateBank and also pointed to evidence suggesting that there may have been additional schemes to defraud occurring at Delgado's businesses. And where the Government has shown reason to believe that fraud significantly permeates an entire business, it is entitled to examine a broader range of materials. *See Bentley*, 825 F.2d at 1110 ("When the whole business is a fraud, the warrant properly may permit the seizure of everything the agents find."); *United States v. Hughes*, 823 F. Supp. 593, 603–04 (N.D. Ind. 1993) ("In order to search an organization riddled with the alleged fraudulent actions and machinations as outlined by the government, a warrant of such ilk would be required to ascertain the full length and breadth of the alleged criminal activity."). Notably, Delgado fails to identify a single document that was improperly seized due to the lack of a time frame. *See United States v. Hills*, 618 F.3d 619, 634 (7th Cir. 2010) (concluding the warrant was not overbroad, in part, because the defendants could not identify any particular evidence seized that was not authorized by the warrant); *Hernandez*, 2010 WL 26544, at *10 ("[The defendant] fails to point to any items collected due to the alleged lack of particularity that should have been excluded by a more detailed warrant.").

Next, Delgado argues that the search warrants were defective because they identify PrivateBank pseudonymously as "Bank A" rather than by its actual name. The Government's failure to use PrivateBank's name in the search warrants raises concern because a search warrant itself should allow the executing officers to identify the things to be seized with reasonable certainty. And here, the search warrants listed several categories of information to be seized relating to Bank A but provided no further identifying information such that the executing officers could ascertain from the warrant that Bank A referred to PrivateBank.

22

On the other hand, the search warrant's reference to Bank A does tend to limit the executing officers' discretion by alerting them that relevant materials relate to a single bank. And after the Court expressed concern about the warrants' use of a pseudonym when referring to PrivateBank and directed the Government to make a supplemental submission, the Government advised that the warrant affidavit's affiant briefed the executing officers prior to the search regarding the true identity of Bank A. (Gov.'s Suppl. Filing at 2, Dkt. No. 147; Gov.'s Resp. to Delgado's Suppl. Filing, Ex. A, Hagstrom Aff. ¶ 3, Dkt. No. 158-1.) That the executing officers were aware that Bank A referred to PrivateBank and limited their search accordingly suffices for particularity purposes. Indeed, the Seventh Circuit has expressly held that "relevant information known by executing officers . . . can be relied upon to validate a warrant if the description contained in the warrant itself is less than complete." *United States v. Gahagan*, 865 F.2d 1490, 1498 (7th Cir. 1989); *see also Jones*, 54 F.3d at 1292 (observing that while "particularity is normally shown on the face of the warrant or in an affidavit properly incorporated in the warrant," in some limited circumstances, "the particularity could be supplied by the executing officer's knowledge that there was a particular place to be search, known to both him and the magistrate judge at the time the warrant was issued" (internal quotation marks omitted)).

To the extent any of the particularity issues identified by Delgado might invalidate the search warrants, it does not necessarily follow that seized evidence must be suppressed. Rather, searches conducted pursuant to a warrant lacking particularity may nonetheless be valid under the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). *Jones v. Wilhelm*, 425 F.3d 455, 464 (7th Cir. 2005). "Under this exception, the fruits of a search based on an invalid warrant may be admitted if the officers who executed the search relied upon the warrant in good faith." *United States v. Yarber*, 915 F.3d 1103, 1106 (7th Cir. 2019). Where, as here, an

officer decides to obtain a warrant, they are entitled to a presumption of good faith. *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005). Yet one circumstance where the presumption can be rebutted is where the warrant is so facially deficient that no reasonable officer would have relied on it. *United States v. Glover*, 755 F.3d 811, 819 (7th Cir. 2014).

The Court finds that a reasonable officer could have relied on the search warrants here. "[P]olice officers are charged with knowledge of well-established legal principles, and the corresponding responsibility to learn and follow applicable legal precedent." *United States v. Searcy*, 664 F.3d 1119, 1124 (7th Cir. 2011) (internal quotation marks and citation omitted). But Delgado comes forward with no authority suggesting that the warrants' use of a pseudonym in place of PrivateBank should have alerted the executing officers to the warrants' invalidity. Nor is the Court aware of any authority addressing a similar situation. Moreover, the Court is unaware of any controlling Seventh Circuit precedent definitively establishing that a warrant must include a time limitation with respect to the items to be seized. And the varying approaches taken by courts inside and outside of this Circuit with respect to the issue demonstrate the lack of well-established legal principles regarding the necessity of temporal limitations.

In sum, the Court finds that the warrants here supplied the executing officers with enough information for them to identify the items to be seized with reasonable certainty. For that reason alone, the Court declines to suppress the evidence seized pursuant to the warrants for lack of particularity. Even if any particularity issues could call the validity of the warrants into question, the Court still would not suppress evidence on that basis because the deficiencies were not so plain as to rebut the applicability of the good-faith exception.

### D.    Retention of Seized Materials

Next, Delgado argues for suppression based on the fact that the Government has retained the items it seized pursuant to the search warrants for over four years. But the Government commits no Fourth Amendment violation when it retains items seized pursuant to valid search warrants while a criminal prosecution is pending. Rather, it is only after the termination of criminal proceedings that the owner has the right to the return of the property. *See e.g.*, *Thompson v. United States*, 719 F. Supp. 2d 977, 980 (N.D. Ill. 2010) ("It is well settled that upon the termination of criminal proceedings, seized property, other than contraband, should be returned to the rightful owner."). Moreover, the procedure for seeking the return of property seized by the Government is by way of a motion under Federal Rule of Criminal Procedure 41(g). *See United States v. Norwood*, 602 F.3d 830, 832 (7th Cir. 2010) ("Rule 41(g) . . . authorizes the judge presiding in a criminal case to order the government to return property of the defendant that is in its possession if it has no reason to continue holding the property."). Yet Delgado has filed no Rule 41(g) motion and she does not even specify what seized items she wants returned to her.

### E.    Violations of Filter Protocol

Finally, Delgado asserts that the Government violated the warrant affidavit's filter protocols for the collection and review of potentially privileged items. Specifically, the affidavit recognized the potential that the searches might result in the collection of documents containing privileged information. (Warrant Aff. ¶ 106.) To mitigate the risk that the prosecution would view privileged materials, the Government stated that it would organize a filter team consisting of individuals who would not be involved in the investigation or prosecution of the case. (*Id.* ¶ 107.) The filter team would then review potentially privileged seized items and forward to the prosecutors only those items that were not covered by an applicable privilege. (*Id.*)

Delgado claims that the Government violated the filter protocol by assigning Assistant United States Attorney ("AUSA") Rick Young to the filter team despite Young previously serving as second chair on the prosecution team. The Court directed the Government also to address this issue in the aforementioned supplemental filing. In its submission, the Government acknowledges that Young briefly served on the prosecution team prior to being assigned to the filter team but notes that Young did no substantive work for the prosecution team and did not review any discovery materials during his assignment. (Gov.'s Suppl. Filing, Ex. 1, Young Aff. ¶ 4, Dkt. No. 147-1.) Moreover, the Government explains that Young was shifted to the filter team because he realized shortly after his assignment to the prosecution team that he had previously supervised an AUSA involved with the filter team. (*Id.* ¶ 5.) During the time Young supervised that AUSA, he neither reviewed any seized materials nor had any substantive discussions about the case with his supervisee. (*Id.* ¶ 3.) Nonetheless, Young promptly notified his supervisor of the conflict, at which point he became the assigned filter-team AUSA. (*Id.* ¶ 5.)

Although the Government acted quickly to remedy Young's potential conflict, Delgado now argues that the violation of the warrant affidavit's filter-team protocols requires suppression of all evidence seized pursuant to the search warrants. However, because "[t]he attorney-client privilege is an evidentiary privilege, not a constitutional right," even if the Government did somehow violate Delgado's privilege here, it would not necessarily require the suppression of derivative evidence. *United States v. Segal*, 313 F. Supp. 2d 774, 780 (N.D. Ill. 2004). Rather, Delgado "would only be entitled to the suppression of derivative evidence if the Government's conduct violated [her] constitutional rights." *Id.* Delgado might argue that the Government's disregard for her attorney-client privilege could amount to a violation of her right to due process.[5]

---

[5] Since none of the potentially privileged seized items related to Delgado's communications with her former criminal defense counsel, there is no Sixth Amendment issue. *United States v. White*, 879 F.2d

"The violation of a defendant's attorney-client privilege, however, will only violate the defendant's due process rights if the violation was caused by serious governmental misconduct that is outrageous enough to shock the conscience of the Court." *Id.* Here, Delgado has no evidence that Young's conflict resulted in any intrusion into her privileged information, and Young's accidental involvement with both the prosecution and filter team hardly shocks the conscience.

In addition, Delgado takes issue with the continued involvement of an FBI agent who participated in an interview of Delgado's former corporate counsel and was then subsequently walled off from the prosecution team based on what he learned during that interview. Notwithstanding the Government's contention that the FBI agent had been walled off from the investigation, Delgado notes that, after supposedly being walled off, the agent's name appeared in a tax-disclosure application and the agent was present during Delgado's arrest. But again, even if the FBI agent had some minimal involvement in the investigation after being walled off, Delgado has not shown that his involvement resulted in the disclosure of privileged information. Nor do Delgado's claims regarding the agent's continued involvement investigation rise to the level of conscience-shocking conduct warranting suppression.[6] Consequently, the Court finds no reason to suppress any evidence based on filter-team protocol violations. And because Delgado's other grounds for suppression are unavailing,[7] her motion to suppress is denied.

---

1509, 1513 (7th Cir. 1989) ("Exclusionary remedies are strong medicine, normally reserved for constitutional violations and challenged even there, and when the attorney is not the defendant's criminal defense attorney there is . . . no Sixth Amendment issue.").

[6] This Court's ruling should not be construed as precluding Delgado from asserting individual privilege issues by way of a motion *in limine* in advance of trial. At this time, the Court takes no position as to the admissibility of any evidence or testimony at a potential trial.

[7] In a supplemental filing, Delgado highlights the fact that the Government has provided her different versions of the search warrants and warrant affidavit in an effort to question the documents' validity. (*See* Delgado's Suppl. Filing, Dkt. No. 156.) But the only difference between the various versions of the

**CONCLUSION**

For the foregoing reasons, Delgado's motion to dismiss the Indictment (Dkt. No. 109) and

motion to suppress (Dkt. No. 101) are denied, and Houck's motion for a bill of particulars (Dkt.

No. 116) is also denied.

ENTERED:

Dated:  January 20, 2023

_____
Andrea R. Wood
United States District Judge

---

documents relate to how they were stamped (*e.g.*, "FILED" versus "RECEIVED")—otherwise the
documents are substantively identical. Needless to say, such non-substantive clerical matters do not give
the Court reason to question the validity of documents bearing the signature of a Magistrate Judge.