**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00122 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CAROL J. DELGADO and | ) | |
| BRENT D. HOUCK | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Carol Delgado and Brent Houck were indicted on five counts of bank fraud in violation of 18 U.S.C. § 1344(1). Broadly speaking, Delgado and Houck were accused of using companies controlled by Delgado to obtain loans from the PrivateBank and Trust Company ("PrivateBank") that they represented would be used for the companies' operations but were actually used for Defendants' own personal benefit. Delgado and Houck were tried together, and the jury returned a verdict finding each Defendant guilty on all five charged counts. Now before the Court are Delgado's and Houck's post-trial motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Dkt. Nos. 234, 243, 245.) For the reasons that follow, Delgado's and Houck's respective motions are denied.

## BACKGROUND

The Indictment charged that, between October 2013 and August 2017, Delgado and Houck were involved in a scheme to defraud PrivateBank, a federally insured financial institution. Specifically, Delgado was alleged to have a controlling interest in two companies: Financial Management Services, Inc. ("FMSI"), a company that made loans primarily to contractors in the construction industry, and Renewable Assets Management Company, LLC ("RAMCO"), a company that provided residential solar financing. Through Delgado, FMSI and

RAMCO entered into business loan and security agreements with PrivateBank under which PrivateBank agreed to lend each company $10 million on a revolving-note basis. As alleged, shortly after entering into the first of the two loan agreements, Delgado and Houck initiated a scheme to defraud PrivateBank. The scheme involved using FMSI and RAMCO to obtain millions of dollars from PrivateBank by falsely representing that the funds would be used for the companies' lending activities when, in fact, Delgado and Houck used a substantial portion of PrivateBank's funds for their own personal expenses. Each of the Indictment's five counts was predicated on a transfer made by PrivateBank to an account associated with Delgado and Houck.

A jury trial commenced on February 5, 2024. The evidence at trial is summarized as follows.

## I.       Overview of the Charged Scheme to Defraud

At trial, the jury heard evidence that FMSI was a finance company that extended loans to construction-industry contractors. Delgado first became involved with FMSI in 2004 when she became its 50% owner, with a silent partner owning remaining 50% of FMSI's shares. After acquiring FMSI, Delgado took control of its day-to-day operations. In addition, Delgado was the 100% owner and in charge of the operations of RAMCO, a company that provided loans to finance the installation of solar panels on residential homes. Houck was a marketing employee at FMSI and, at all relevant times, was romantically involved with Delgado.

In October 2013, Delgado executed on behalf of FMSI a loan agreement with PrivateBank ("FMSI Loan Agreement") under which PrivateBank agreed to provide FMSI with a $10 million line of credit to fund its business operations. Pursuant to the FMSI Loan Agreement, FMSI was prohibited from entering into or permitting to exist "any transaction with any of its Affiliates or with any director, officer or employee." As collateral, FMSI pledged all its assets, which primarily consisted of the loans it made. And to ensure FMSI remained

2

financially viable, the FMSI Loan Agreement required that FMSI submit to an annual audit conducted by an independent auditor. Later, Delgado entered into a separate $10 million loan agreement with PrivateBank on behalf of RAMCO containing materially similar terms as those in the FMSI Loan Agreement. Money drawn from the FMSI and RAMCO lines of credit was intended to remain separate—*i.e.*, FMSI funds were to be used solely for FMSI business and RAMCO funds solely for RAMCO business.

Essentially, FMSI's business was meant to operate as follows: FMSI used the line of credit provided by the FMSI Loan Agreement to fund loans to its customers and made money from charging its customers fees and interest exceeding what it owed to PrivateBank. To draw from the $10 million line of credit, FMSI would contact PrivateBank with a request for funds. Draws from the FMSI Loan Agreement were deposited into a checking account ending in 1664 that FMSI maintained at PrivateBank ("1664 Account"). Jennifer St. Aubin, a PrivateBank employee involved in managing the bank's relationship with FMSI, testified that any funds in the 1664 Account were understood to be part of PrivateBank's collateral. After PrivateBank deposited funds into the 1664 Account, FMSI would then transfer those funds to its customers or use the money for other business expenses.

Pursuant to the FMSI Loan Agreement, FMSI was required to provide PrivateBank with borrowing base certificates, typically on a monthly basis. Those borrowing base certificates listed FMSI's customers and corresponding information regarding the amount and status of each customer's loans. St. Aubin testified that the information contained in the borrowing base certificates was PrivateBank's primary source of insight into its collateral and would be considered each time FMSI requested to draw upon its line of credit. FMSI also submitted

3

monthly compliance certificates to PrivateBank certifying FMSI's compliance with the FMSI Loan Agreement's terms.

While FMSI did conduct legitimate business, the Government introduced evidence at trial showing that Defendants also diverted a portion of PrivateBank's funds for their personal use. Among the personal expenses paid from loan proceeds were costs related to training Defendants' racehorses, renovations to their Florida condominium, the purchase of a property in Naperville, Illinois, and payments to an architect designing and building a home in Naperville. Altogether, the evidence at trial showed that Defendants used for themselves approximately $1.4 million traceable to FMSI's and RAMCO's lines of credit with PrivateBank. Since the FMSI Loan Agreement and the RAMCO agreement required the companies to use the funds only for business purposes and prohibited transactions with affiliates, Defendants worked to make those personal transactions appear legitimate.

The crux of Defendants' scheme to defraud was their creation of ten fictitious companies that they represented as legitimate FMSI customers to PrivateBank and employees of FMSI and RAMCO. The Government's evidence included FMSI internal records reflecting a sale to one of the fictitious companies that were prepared just in advance of an FMSI transfer that the Government traced to Defendants' personal use. Those companies were then listed on the borrowing base certificates that FMSI submitted to PrivateBank, along with details regarding the "loans" those companies received.

In addition, the Government introduced evidence of FMSI's internal paperwork for the fictitious companies that revealed links between those companies and various family members and friends of Defendants. For example, one customer that received $500,000 from FMSI was Morgan Property Ventures, LLC ("Morgan Property"). The internal FMSI credit application for

Morgan Property was signed by Linda Salas, who was a friend of Defendants. Similarly, Salas supposedly signed a document submitted to FMSI's independent auditor. When PrivateBank reached out to a Morgan Property email address, it received a response, seemingly from Salas. Yet, at trial, Salas testified that she had no knowledge of a company called Morgan Property, her signature on the credit application was forged, and she had never used an email address associated with Morgan Property. For another customer, Solar IAD, LLC ("Solar IAD"), FMSI had on file a credit application signed by Houck's sister, Constance Dean, who testified at trial that she did not sign or know anything about the application. Yet another customer, Janaye Alexis, LLC, shared its name with Delgado's daughter. Likewise, for the remaining seven fake companies, the Government introduced evidence that each was linked to one or both Defendants.

## II.    Evidence Supporting Charged Counts

Each count of the Indictment alleges an execution of the scheme to defraud in the form of a transfer of funds from PrivateBank that Defendants diverted to their personal use. At trial, the Government introduced evidence as to each charged transfer that traced the funds' path from the 1664 Account to the payment of some personal expense of Defendants.

### A.    Count I

Count I concerns a May 12, 2015, transfer of $37,430 to a bank account held in both Defendants' names. The Government introduced evidence reflecting such a transfer of funds being made on May 12, 2015. That initial transfer was followed by a series of three additional transfers—all occurring the same day. First, following its receipt of the $37,430 from the 1664 Account, the account held in both Defendants' names transferred the same amount to an account held in Delgado's name. This was followed by a transfer of $36,247 from Delgado's account to RAMCO's business account. Finally, the RAMCO account transferred $36,246 to JB Architecture Group ("JB Architecture"). At trial, the owner and operator of JB Architecture

testified that Defendants had hired him to build a house in Naperville behind their primary residence.

### B. Count II

Count II arises out of a May 15, 2015, transfer of $108,350. The evidence at trial showed a transfer of $108,350 from the 1664 Account to an account held by both Defendants. That same day, $50,000 was transferred from Defendants' account to an account in Houck's name; that was followed by a transfer of $40,000 from Houck's account to an account in the name of Carent Stables LLC, of which Houck was also a signatory. Carent Stables was the name under which the horses owned by Defendants raced. The Government's evidence showed that some of the money received by the Carent Stables LLC account went toward horse training expenses. Also on May 15, $58,350 was transferred from Defendants' account to an account in Delgado's name, and then Delgado's account transferred $60,000 to RAMCO's business account.

### C. Count III

In Count III, Defendants allegedly transferred $479,000 on August 6, 2015, to pay for their purchase of a property in Naperville. At trial, the jury heard that $479,000 was transferred from the 1664 Account directly to a company called BNF Home Closing Services, Inc. The evidence further showed that, on August 6, 2015, Defendants paid approximately the same sum to close on their purchase of a property in Naperville. While PrivateBank approved the transfer, St. Aubin testified that, at the time, the bank was not aware where those funds were going.

### D. Count IV

As charged, Count IV involved a transfer of $32,000 on January 14, 2016. The evidence at trial showed that the transfer actually occurred on January 15, 2016, but was otherwise consistent with the charge. Specifically, $32,000 was sent from the 1664 Account to the Carent Stables LLC account. Four days later, $32,000 was sent from the Carent Stables LLC account to

6

Defendants' joint account. Then, on January 21, 2016, $32,000 was transferred from Defendants' account to the RAMCO business account. That same day, RAMCO transferred $32,000 to the bank account of Corry's Creations and Construction ("Corry's Creations").[1] The owner of that company testified that he received the $32,000 as payment for his work renovating Defendants' Florida condominium.

### E.    Count V

Finally, Count V alleges a $113,585 transfer occurring on June 30, 2016. Again, the evidence at trial showed a slight discrepancy between the actual and alleged date of the transfer, but otherwise s that, on July 1, 2016, $113,585 was transferred from the 1664 Account directly to JB Architecture. JB Architecture's owner testified that this payment of $113,585 from Defendants on July 1, 2016, was made in connection with his work constructing a second house behind Defendants' primary residence in Naperville.

### DISCUSSION

At the conclusion of the trial, the jury returned guilty verdicts as to both Delgado and Houck with respect to each of the five charged counts. Defendants have each moved for a judgment of acquittal or, in the alternative, a new trial.[2]

### I.    Motions for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, when "the evidence presented at trial is insufficient to support a conviction, a district court must enter judgment of acquittal either after the government has closed its evidence or after a jury has rendered a verdict or been discharged."

---

[1] The Government includes Corry's Creations as one of the fictitious companies receiving FMSI loans, though it acknowledges that Corry's Creations itself is a real company—just not a real customer of FMSI.

[2] The Government moved for leave to file a consolidated response to both Defendants' motions exceeding the applicable page limits. (Dkt. No. 249.) That motion is granted.

*United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019) (internal quotation marks omitted). In considering a motion for judgment of acquittal, the district court must "view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor." *Id.* (internal quotation marks omitted). Furthermore, "any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable burden" and courts will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). Many of Defendants' respective arguments for a judgment of acquittal overlap. The Court will begin with those common arguments, and then address each Defendant's respective individual arguments for acquittal.

### A.    Common Arguments

Both Delgado and Houck contend that the Government failed to introduce sufficient evidence of a scheme to defraud, that the evidence did not adequately connect PrivateBank's money to their personal expenditures, and that the Government's proof at trial constructively amended the Indictment. The Court addresses each contention in turn.

### 1.    *Proof of Scheme to Defraud*

To convict a defendant under 18 U.S.C. § 1344(1), the Government must prove beyond a reasonable doubt: "(1) there was a scheme to defraud a financial institution; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; and (4) the deposits of the financial institution were insured by the [Federal Deposit Insurance Corporation] at the time of the charged offense." *United States v. Ajayi*, 808 F.3d

1113, 1119 (7th Cir. 2013) (internal quotation marks omitted).[3] Further, the scheme must "involve[] a materially false or fraudulent pretense, representation, or promise." *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020).

As to the first element, a "scheme to defraud" requires the Government to show that the defendant "engage[d] in a pattern or course of conduct designed to deceive a financial institution with intent to cause actual or potential loss." *United States v. LeDonne*, 21 F.3d 1418, 1427–28 (7th Cir. 1994); *see also United States v. Norton*, 108 F.3d 133, 135 (7th Cir. 1997) ("Whether a scheme to defraud exists is determined by examining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness or fair play and candid dealings in the general life of the community." (internal quotation marks omitted)).

Here, the Court finds that there was ample evidence supporting the jury's finding of a scheme to defraud. In particular, the jury heard evidence that Defendants represented to PrivateBank that FMSI's draws on the $10 million line of credit would go toward FMSI's business operations and expressly agreed that the money would not go to an officer like Delgado or an employee like Houck. Nonetheless, the Government showed how various transfers from the 1664 Account ended up paying personal expenses for both Defendants. Further, those transfers were reported both internally and to PrivateBank as loans to companies that did not exist.

The misrepresentations concerning FMSI's lending activities were undoubtedly material, as they impacted PrivateBank's understanding of its collateral in FMSI's assets. FMSI's entire business consisted of loans—the company only made money if its customers were repaying their

---

[3] The parties stipulated that PrivateBank was a financial institution insured by the Federal Deposit Insurance Corporation.

loans with interest in accordance with their relevant agreements with FMSI. Thus, PrivateBank's willingness to permit FMSI to borrow on its line of credit was based on its evaluation of whether FMSI's lending activities were generating sufficient returns to ensure that PrivateBank would ultimately be repaid by FMSI. A reasonable jury could conclude that such evaluation was materially impaired when at least $1.4 million worth of FMSI's reported loans went to non-existent companies with the funds routed to pay for various of Defendants' personal needs. St. Aubin, a PrivateBank employee, testified that PrivateBank would not have continued to lend to FMSI had it known that its money was being diverted to such use, and PrivateBank ultimately did terminate its agreements with both FMSI and RAMCO once it began to unravel Defendants' scheme. And PrivateBank unquestionably faced a risk of loss where its money was sent to a recipient that was not an FMSI customer who had agreed to pay the sum back with interest.

Next, the jury heard evidence that each charged transfer was an execution of the scheme to defraud. "An act is an indictable 'execution' rather than a non-indictable 'act in furtherance' when the act puts the bank at an additional financial risk." *Ajayi*, 808 F.3d at 1124. Generally, "a separate execution must be chronologically and substantively independent." *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995). That will be the case "where no act depended on others for its existence, and each act had its own function and purpose—they were interrelated only because they involved the same overall scheme." *Ajayi*, 808 F.3d at 1124 (internal quotation marks omitted). Here, each charged transfer that went to Defendants' personal needs was, unlike FMSI's legitimate loans, money that was unlikely to be repaid, thereby constituting a separate loss to FMSI's overall business. Put another way, each individual transfer was akin to a new bad loan that decreased the value of PrivateBank's collateral in FMSI's overall loan portfolio. Consequently, an individual charged transfer created an independent risk of loss to FMSI

through its additional detrimental impact to PrivateBank's collateral. *See United States v. Ford*, No. 12 CR 927, 2013 WL 5878261, at *3 (N.D. Ill. Oct. 31, 2013) ("Each disbursement of funds was related to a specific separate transaction, associated with a different property, and supported by independent false representations about what [the defendant] intended to do with the money. Each of the false representations 'created a new and independent risk' for the bank." (quoting *Allender*, 62 F.3d at 913)).

Finally, Defendants' intent to defraud is evidenced by their efforts to disguise transfers to themselves as legitimate FMSI business, namely, through their creation of fictitious companies that they passed off as FMSI customers on borrowing base certificates presented to PrivateBank and internal FMSI paperwork. Had any of the payments been legitimate, there would have been no need for Defendants to create fake companies and disguise the nature of the payments both internally and to PrivateBank. *See, e.g.*, *United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995) ("Intent to defraud can be proven by circumstantial evidence and by inferences drawn from the scheme itself.").

Simply put, the evidence at trial showed that Defendants engaged in a course of conduct that caused FMSI to engage in transactions prohibited by the FMSI Loan Agreement while taking various steps to conceal the true nature of those transactions from PrivateBank, and that scheme posed a risk to FMSI's finances, which served as PrivateBank's collateral. That evidence sufficed for the jury to find beyond a reasonable doubt the existence of a scheme to defraud.

### 2.    *Tracing of Transfers*

According to Defendants, the Government failed to prove bank fraud because it was unable to show that any of the charged transfers consisted of PrivateBank's funds. Instead, they note that, when FMSI drew on its line of credit with PrivateBank, the bank deposited the funds into the 1664 Account. That general business account contained funds from many different

11

sources, including all the payments by FMSI's customers on their outstanding loans. Defendants therefore argue that, because the charged transfers did not come directly from FMSI's line of credit with PrivateBank but from the undifferentiated funds in the 1664 Account, the Government failed to prove that any transfer consisted of PrivateBank's money.

Defendants appear to contend that FMSI's commingling of PrivateBank funds with other sources of money allowed Defendants subsequently to misappropriate funds in the 1664 Account with impunity. That cannot be the case. On the contrary, the Seventh Circuit has "broadly interpreted the range of schemes covered by [§ 1344(1)] as being limited only by a criminal's creativity." *United States v. Yoon*, 128 F.3d 515, 522 (7th Cir. 1997) (internal quotation marks omitted). Certainly, Defendants are not entitled to acquittal because their scheme to defraud was enmeshed with FMSI's other ordinary and legitimate business activities. The fraudulent FMSI loans were not hermetically sealed from the rest of FMSI's business. Rather, the bad loans weighed down FMSI's overall balance sheet, creating the risk that there would not be enough money coming in from FMSI's legitimate business to make up for the losses from transfers unlikely to be repaid. In turn, that created a risk that FMSI would not have sufficient funds (including the money in the 1664 Account) or other assets for PrivateBank to collect toward repayment for FMSI's draws on its line of credit. It is precisely that risk of loss that the bank fraud statute was designed to punish. *See Ajayi*, 808 F.3d at 1124 ("[T]he crime of bank fraud is complete when the defendant places the bank at risk of financial loss, and not necessarily when the loss itself occurs." (internal quotation marks omitted)).

### 3. *Constructive Amendment*

Each count of the Indictment charged that Defendants executed or attempted to execute the scheme "by causing the PrivateBank to transfer" a specified sum of money to a recipient account associated with some personal use of Defendants. Yet, according to Defendants, the

Government's proof at trial showed that the funds were transferred out of the 1664 Account such that the transfer was made by FMSI rather than PrivateBank. Defendants contend that this purported inconsistency between the trial evidence and the crimes charged effected a constructive amendment to the Indictment warranting a judgment of acquittal.

An indictment is constructively amended "when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented to the grand jury." *United States v. Griffin*, 76 F.4th 724, 736 (7th Cir. 2023) (internal quotation marks omitted). One instance where an indictment will be found to have been constructively amended is "where a complex set of facts is presented to the jury during the trial which is distinctly different from the set of facts set forth in the charging instrument." *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007) (internal quotation marks omitted). "That said, not all variations in proof that contradict or supplement verbiage in the indictment . . . amount to a constructive amendment." *United States v. Haas*, 37 F.4th 1256, 1266–67 (7th Cir. 2022) (internal quotation marks omitted). Rather, a constructive amendment will only be found where the charged offense is "materially different or substantially altered at trial, so that it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* (internal quotation marks omitted).

Here, the evidence at trial showing that PrivateBank deposited funds drawn from FMSI's revolving line of credit into the 1664 Account, rather than directly transferring funds from the line of credit to Defendants' personal use, is fully consistent with the crimes charged. *United States v. Heon Seok Lee*, 937 F.3d 797, 806 (7th Cir. 2019) (finding no constructive amendment to the indictment because "[t]he government did not attempt to prove a crime different from the

13

one alleged"). That PrivateBank's money did not directly travel from the PrivateBank line of credit to its illicit use does nothing to change the nature of the fraud perpetrated on the bank. It remains the case that Defendants caused PrivateBank to make deposits into the 1664 Account by making misrepresentations about FMSI's lending activities and its compliance with the FMSI Loan Agreement. The essence of the charged scheme to defraud was those deceptive means by which Defendants gained access to PrivateBank's funds and the resulting risk of loss that PrivateBank faced from Defendants' misappropriation of money from the 1664 Account.

Nor was there an impermissible variance between the evidence regarding the path of PrivateBank's funds and the Indictment's allegations. "A variance between indictment and proof exists when the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Ratliff-White*, 493 F.3d at 820 (internal quotation marks omitted). However, for a variance to be fatal, a defendant must be "prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him." *Ajayi*, 808 F.3d at 1125 (internal quotation marks omitted). Evidence showing that PrivateBank did not directly transfer money from FMSI's line of credit but instead deposited it into the 1664 Account simply provided a fuller picture of how Defendants caused PrivateBank to make the charged transfers. Such "[a]dditional evidence regarding technical details about how a defendant executed an alleged scheme does not constitute an impermissible variance." *Heon Seok Lee*, 937 F.3d at 807; *see also Ajayi*, 808 F.3d at 1125 ("The proof at trial is necessarily more detailed than the facts alleged in the indictment, which is simply a plain, concise and definite written statement of the essential facts constituting the offense charged." (internal quotation marks omitted)).

### B.    Delgado's Individual Arguments

In her motion, Delgado advances several arguments for why there was insufficient evidence to sustain the guilty verdicts against her that the Court can quickly reject. First, Delgado faults the Government for alleging in the Indictment and arguing at trial that the FMSI Loan Agreement was between FMSI and PrivateBank, when the evidence showed that it was actually FMSI of Delaware, Inc. that executed the FMSI Loan Agreement. But Delgado does not deny that she owned and controlled FMSI of Delaware, Inc. or that FMSI of Delaware, Inc. wholly owned FMSI. Moreover, the company incorporated in Ohio as FMSI was determined to be defunct prior to the finalization of the FMSI Loan Agreement, which resulted in FMSI of Delaware, Inc. being substituted as the borrower in the executed agreement. And the Court notes that the 1664 Account statements listed it as being held by "FMSI of Delaware, Inc. D/B/A Financial Management Services, Inc." What matters is that the jury had proof that Delgado used an FMSI entity over which she had control to defraud PrivateBank—that the entity was FMSI of Delaware, Inc. as opposed to FMSI offers her no defense.

Next, Delgado asserts that she must be acquitted because the funds in the 1664 Account were not PrivateBank's collateral. This is a point that the Court has already discussed above. It suffices to reiterate that the FMSI Loan Agreement gave PrivateBank a security interest in all of FMSI's then-existing and later-acquired assets, and that encompasses all funds in the 1664 Account whether or not traceable to deposits from the PrivateBank line of credit.

Several points raised by Delgado boil down to a claim that evidence of misrepresentations not directly communicated to PrivateBank cannot support a conviction for bank fraud. As an initial matter, to prove bank fraud, it is not necessary for the Government "to prove that the defendant made any specific misrepresentations or false statements." *United States v. Higgins*, 270 F.3d 1070, 1074 (7th Cir. 2001). "[T]he focus of the offense of a scheme to

defraud is on the intended end result, not on whether a false representation was necessary to effect the result." *LeDonne*, 21 F.3d at 1426. Nonetheless, the jury heard ample evidence that Defendants used false statements and misrepresentations to deceive PrivateBank into continuing to lend to FMSI. Although not all their misrepresentations were directly communicated to PrivateBank, all were in service of the scheme to defraud. For example, the internal FMSI paperwork for the fictitious companies and the communications about the fictitious companies to FMSI's auditor were designed to conceal the fraudulent scheme from those who might report it.

Moreover, misrepresentations were affirmatively communicated to PrivateBank through the borrowing base certificates listing the fictious companies as FMSI loan recipients. Delgado contends that she cannot be held responsible for those miscommunications because she did not sign the borrowing base certificates. But an FSMI employee testified at trial that the information contained in the borrowing base certificates was supplied by Delgado and that Delgado reviewed the borrowing base certificates before they were sent to PrivateBank. Though not necessary to sustain the bank fraud convictions, the evidence demonstrates that Delgado caused false statements and misrepresentations of fact to be made to PrivateBank.[4]

Finally, Delgado protests that the evidence shows, at most, a breach of the FMSI Loan Agreement, and breach of contract does not amount to criminal bank fraud. As explained above, however, the Government's proof showed that Delgado's conduct went far beyond merely breaching the FMSI Loan Agreement and was consistent with a scheme to defraud PrivateBank.

---

[4] Delgado also takes issue with the fact that the evidence regarding the borrowing base certificates largely post-dated the charged executions. But that is unsurprising, since the borrowing base certificates reported information about outstanding loans. With respect to the "loans" going to Defendants' personal use, the borrowing base certificates were after-the-fact misrepresentations designed to make the transfers appear as if they were made in the ordinary course of FMSI's business. *See Ajayi*, 808 F.3d at 1120 ("Although the crime is complete when the bank is put at risk of financial loss, a defendant could still engage in subsequent acts in furtherance of the scheme that are not indictable, but are still part of the scheme.").

### C.     Houck's Arguments

For his part, Houck attacks the strength of the evidence supporting the jury's finding of his guilt. While the evidence at trial unquestionably tended to show that Delgado spearheaded the scheme to defraud PrivateBank, this Court has previously explained that "the Government [was] not required to prove that Houck 'personally and directly executed every part of the scheme and prepared every document involved.'" *United States v. Delgado*, No. 18-cr-00122, 2023 WL 349841, at \*4 (N.D. Ill. Jan. 20, 2023) (quoting *Ginsberg*, 971 F.3d at 696). Rather, the evidence need only show that Houck "knowingly, with an intent to defraud, ***participated*** in a scheme involving materially false representations." *Id.* (quoting *Ginsberg*, 971 F.3d at 967); *see also United States v. Jackson*, 546 F.3d 801, 815–16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance of the scheme; so upon finding that [the defendant] was a knowing participant in the scheme, the jury was free to hold him to account for any fraudulent misrepresentations that were made by [his co-schemers] after he joined the scheme.").

Here, the Court finds that the jury had sufficient evidence from which to conclude beyond a reasonable doubt that Houck participated in the scheme and did so with the intent to defraud PrivateBank. The jury learned that Houck and Delgado were involved in a romantic relationship, and multiple witnesses described them as inseparable. Three of the five charged transfers were routed through a bank account associated with Houck, including one transfer that passed into and out of an account held solely in Houck's name.[5] Further, the Government

---

[5] Houck emphasizes that the transfers to his accounts were from the 1664 Account, and there was no evidence showing his awareness that the money was derived from a source other than FMSI. Yet Houck has not pointed to any evidence of an alternative explanation why his employer was transferring him large sums of money. At times he suggests that FMSI had extended him personal loans, but the jury received no evidence documenting any loan agreement between FMSI and Houck. Viewed in the context of the

presented evidence demonstrating that Houck was coordinating the payments for multiple of Defendants' personal expenses. Thus, the owner of Corry's Construction testified that Houck was his primary point of contact regarding payment for the work the company was doing on Defendants' Florida condo. And the Government introduced emails showing that the owner sent the company's bank account routing information to an email address associated with Houck. Eleven days later, RAMCO wired $32,000 to that Corry's Construction account.[6] JB Architecture's owner also testified that Houck was his primary contact regarding payment for his work constructing Defendants' second house in Naperville.

The jury also heard testimony about how Houck was directly involved in efforts to conceal the true nature of certain of the fictitious companies that were represented to have received loans. For example, as discussed above, the credit application submitted to one company, Solar IAD, was signed in the name of Houck's sister, Constance Dean, and her home address was listed as Solar IAD's business address. When called to testify at trial, Dean denied any knowledge of, or association with, Solar IAD. Dean further testified that when she received a subpoena from PrivateBank about Solar IAD, she reached out to Houck who told her that the subpoena related to an issue that Delgado was having with PrivateBank and was being handled by Delgado's attorneys.

Similarly, the jury heard evidence that Houck reached out to another individual listed as the principal of a fictitious company. In particular, Joseph Macaluso was listed as the principal of

---

other trial evidence, the jury could reasonably infer that Houck knew FMSI's transfers to his accounts were part of the scheme to defraud.

[6] This $32,000 transfer gave rise to Count IV. As discussed above, the $32,000 reached RAMCO's account after being routed from the 1664 Account through two other accounts associated with Defendants.

JNG Global Holdings, LLC ("JNG"). Macaluso was friends with Defendants but testified that he was not a business owner. The Government introduced evidence of a text message that Delgado sent to Macaluso in a string that included Houck. In the message, Delgado explained that she and Houck were "forming a couple of new shell companies in [Florida]" and asked Macaluso if they could list him as an agent, which simply required that he "accept service for any mail and pass it on." Later, while FMSI was in the midst of an audit, Houck sent Macaluso a text message asking him to be on the "lookout for an envelope for JNG" and advised that he would send Macaluso "a FedEx return envelope so you can fedex us the envelope." Upon receiving a letter, Macaluso sent Houck a screenshot of what he received in the mail, and Houck told Macaluso that he would send the FedEx that night. The Government introduced evidence that what Macaluso received was a verification for JNG in connection with FMSI's audit. The evidence of that verification letter revealed that it contained Macaluso's signature, which Macaluso claimed was forged. There was also evidence of FMSI paperwork listing JNG as the customer for the transfer giving rise to Count II.

Other evidence of Defendants' efforts to mislead their auditor included their use of a RAMCO email account for communications with FMSI and RAMCO's auditor. The email address was registered in the name of Jamie Thacker. No individual with that name worked at RAMCO and, in fact, Jamie Thacker was the name of Delgado's daughter's boyfriend at the time of the alleged scheme. The jury saw evidence of Houck's involvement in efforts to make emails from that address appear as if they were coming from an actual RAMCO employee. It also learned that emails from the Thacker account were set to auto-forward to Houck's FMSI email address.

While Houck criticizes the evidence of his own intent to defraud PrivateBank as predominantly circumstantial, that is neither surprising nor a flaw in the Government's case. "Because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *LeDonne*, 21 F.3d at 1426. As shown by the evidence discussed above, there was proof that Houck was involved in directing the misappropriated funds to Defendants' personal use and that he was involved in concealing the true nature of the fictitious companies supposedly receiving loans from FMSI. From that evidence, a reasonable jury could infer Houck's knowing participation in the scheme to defraud PrivateBank.

## II.     Motions for a New Trial

Federal Rule of Criminal Procedure 33 allows a court to vacate a judgment and grant a new trial "if the interest of justice so requires." The "interest of justice" may require a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during the trial." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) (internal quotation marks omitted). Nonetheless, the power to overturn a jury verdict is one "reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (internal quotation marks omitted). The Court addresses each of Defendants' purported bases for a new trial below.

### A.     Denial of Pretrial Motions

Prior to trial, Delgado filed a motion to dismiss the Indictment and a motion to suppress evidence. (Dkt. Nos. 101, 109.) She seeks a new trial based on this Court's denial of those motions, but she advances no new reasons why the Court erred and stands on her previous

arguments. Because the Court finds no error in its denial of Delgado's pretrial motions, it denies Delgado's motion for a new trial for the reasons set forth in that earlier ruling. *Delgado*, 2023 WL 349841. Likewise, Houck seeks a new trial based on the Court's denial of Delgado's pretrial motions, which he joined (Dkt. Nos. 113, 114), and his own pretrial motion for a bill of particulars (Dkt. No. 116). His motion is also denied for the reasons previously stated by the Court. *Delgado*, 2023 WL 349841.

In addition to those pretrial motions, Houck filed a motion to sever his trial from Delgado's trial (Dkt. No. 186), which the Court denied (Dkt. No. 197). One of Houck's asserted bases for severance was the risk he would suffer spillover prejudice from a joint trial with Delgado. Now that Defendants' joint trial has come to pass, Houck asserts that such risk was realized. The Court disagrees. Houck contends that most of the evidence at trial concerned Delgado's dealings with PrivateBank and therefore the jury must have found him guilty based on evidence solely relating to Delgado. But the Court has already discussed above the evidence of Houck's knowing participation in the scheme to defraud PrivateBank, and therefore his spillover prejudice argument is unavailing.

### B.     Denial of Houck's Proposed Jury Instructions

Both Defendants join in calling for a new trial due to the Court's rejection of Houck's proposed jury instruction regarding circumstantial evidence. Specifically, Houck proposed the jury be instructed as follows:

> You may infer facts from other facts that are established by inference, but each link in the chain of inferences must be sufficiently strong so as not to be speculation. The Government may not prove its case with conjecture instead of evidence. Circumstantial evidence that leads only to a strong suspicion that someone is involved in a criminal activity is not a substitute for proof of guilt beyond a reasonable doubt. Evidence that calls for inferences that are motivated or made possible by speculation will fail to carry the government's burden of proof beyond a reasonable doubt.

(Joint Pretrial Statement at 47, Dkt. No. 177.) The Court properly omitted this proposed instruction, which would have risked misleading the jury "by improperly conflating circumstantial evidence and mere 'speculation' . . . and 'suspicion,'" and "encourage[ing] the jury to minimize the import of circumstantial evidence in their deliberations." *United States v. McClain*, No. 20 CR 812, 2024 WL 50868, at *25 (N.D. Ill. Jan. 4, 2024). Instead, the jury received accurate and appropriate instructions on circumstantial evidence and inferences, including that "reasonable inferences" are permissible "so long as they are based on the evidence." (Final Jury Instructions at 6–7, Dkt. No. 222.) The jury was further instructed that a "Defendant's association with persons involved in a criminal scheme is not sufficient by itself to prove his or her membership in the criminal scheme." (*Id.* at 23.) Thus, Houck was able to argue in closing the very points he sought to include in his proposed jury instruction. *See, e.g.*, *United States v. Prude*, 489 F.3d 873, 882 (7th Cir. 2007) (noting the "substantial discretion of the district court for the specific wording of the instructions . . . so long as the essential points are covered by the instructions given." (internal quotation marks omitted)).

### C.    Cumulative Error

Finally, both Defendants assert that they are entitled to a new trial due to the cumulative impact of the errors made at trial. However, neither Defendant has identified an error committed by this Court at trial, let alone cumulative error warranting a new trial.

**CONCLUSION**

For the foregoing reasons, Defendants' motions for a judgment of acquittal or, in the alternative, for a new trial (Dkt. Nos. 234, 243, 245) are denied.

ENTERED:

Dated:  March 18, 2025

_____
Andrea R. Wood
United States District Judge